Gust Pouroudis v. Commissioner.
Pouroudis v. Commissioner
Docket No. 20548.
United States Tax Court
1950 Tax Ct. Memo LEXIS 284; 9 T.C.M. (CCH) 82; T.C.M. (RIA) 50031; February 3, 1950
*284 1. Respondent's determination of income approved for failure of proof of error. 2. Fraud penalties approved. Phillip Nusholtz, Esq., 2346 National Bank Bldg., Detroit 26, Mich., for the petitioner. A. J. Friedman, Esq., and Cyrus A. Neuman, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioner's income tax liabilities and penalties as follows: 25%
50%
Deliinquency
Fraud
Year
Tax
Penalty
Penalty
1942
$ 305.00
$76.25
$ 152.50
1943
171.23
85.62
1944
2,418.33
1,209.17
1945
914.16
457.08
1946
1,515.34
757.67
The basic issue is whether or not the petitioner had income in the amounts determined by the respondent. A second issue is whether or not the respondent erred in imposing the penalties for the years in controversy as set forth above. The case was submitted upon stipulation of facts, exhibits and oral testimony. The facts as stipulated are so found. Other facts are found from the evidence. Findings of Fact The petitioner is a British subject of Greek extraction. He was born on the Island of Cyprus in 1898. *285 The petitioner left school when he was 11 years old and started to work in a grocery store at the age of 12. In 1916 he came to the United States. At that time he had about $30. He went to Lowell, Massachusetts, and got a job as a floor sweeper in a mill at $9 per week. From this time until 1921 he worked as a laborer in New York, Indiana, Illinois, North Dakota, and Ohio, earning from three to seven dollars a day. In 1921 he had a job as a dishwasher in a restaurant in Evanston, Illinois, at $20 a week. Eleven months later he went to East Youngstown, Ohio, and became the proprietor of a coffee house. He invested $600 in this business and sold the place for the same amount about six months later. He then worked near Pittsburgh, Pennsylvania, as a laborer for seven years making six to seven dollars per day. Thereafter for ten months he worked in a restaurant for $30 per week, plus his room and board. By 1930 he had accumulated about $5,000 in bank deposits and cash which he kept in his room. For a few weeks he sold bananas from a push cart in Chicago. He thereafter worked in a fruit store for $30 per week for about 11 months. During this period the petitioner met James Mikis and the *286 petitioner and Mikis decided to become partners in the restaurant business. In 1930 they opened a restaurant in Chicago. The petitioner invested about $5,000, of which about $3,000 represented money advanced to or for Mikis. After about 21 months, Mikis abandoned his interest in the business, still owing the petitioner the $3,000. The business was unprofitable and the petitioner sold it for $150. During the next two years Mikis borrowed more money from the petitioner and in 1935 owed him about $5,000. By 1941 Mikis had paid back $300 or $400 on this loan. At December 31, 1941, the amount outstanding was $4,700. He completed the repayment in 1946. There was no written record ever made of this loan. In 1933 the petitioner paid $900 for an interest in a restaurant in Cicero, Illinois, but this venture was a failure and two weeks later he returned to Chicago and opened another restaurant with a man named Pavlados. This venture was successful for a time. The petitioner next moved to Marion, Ohio, and operated unprofitably a restaurant there for about four months. In 1935 the petitioner moved to Detroit, Michigan, and worked there as a cook and waiter for about a year. His earnings during *287 this period varied from $10 to $20 a week. In 1936 petioner bought an interest in a restaurant in Detroit for $300. This arrangement lasted for about four months. He then abandoned this business and bought an interest in another restaurant for $750 where he worked for the next 21 or 22 months. His partner bought him out for $750 and two months later he invested $1,300 in an unsuccessful restaurant venture, which he abandoned in three months. For the next three or four months he worked in several places and finally again got a job working for a man named Stevenson in a restaurant. His starting salary was $18 a week. He received several raises in pay until he was getting $55 a week, when he quit in December 1943. Early in 1944 petitioner invested $3,500 in a partnership with John Bitzane and the partners did business as Bitzane's Restaurant in Detroit. After six or seven months petitioner sold his interest for $3,500 and was idle for the next month and a half. The petitioner in 1945 put $3,000 into a partnership with two others and they operated a place known as the J. Quality Restaurant. After three or four months a man named Peter Klaris and the petitioner bought out the other *288 two original partners. This arrangement continued for about four months. About a year later, in 1946, the petitioner sold his interest for $3,333.33. While petitioner was associated with Klaris in this venture he loaned Klaris $2,000, which was repaid in 1946. In 1946 petitioner loaned $5,000 to a man named Vassilou. This money was withdrawn from the petitioner's bank account. The loan was repaid in 1947 in payments of $1,000 and $4,000. The petitioner is not married and he has no dependents. In 1944 or 1945 the petitioner sent $500 to his sister in Cyprus. This was the only money he contributed to the support of his relatives during the taxable years. In 1945 petitioner paid $100 in attorney's fees for legal services rendered. The petitioner always got his meals in the restaurant where he worked or in which he had an interest. The petitioner's room rent in 1942 and 1943 was $10 a month. In 1944 it was $12 and in 1945, 1946, and 1947 it was $14 per month. This room rent included laundry until 1944 and thereafter his laundry expenses were $5 or $6 per month. The petitioner usually bought one suit a year at about $22.50 per suit. In 1946 he expected to return to Europe and he *289 bought three suits for $170. The petitioner generally worked six days a week and about ten hours a day. He did no entertaining and he never had a vacation. He attended movies about once a week. During the entire period here involved the petitioner spent his leisure time playing cards for money in a coffee house. In 1946, after he sold his interest in the J. Quality Restaurant, petitioner gambled at cards almost daily. He made a return for 1947 of $2,730.65, of which $2,665 was listed as other income from games of chance. The petitioner kept no record of any of his gambling transactions. The petitioner was in the habit of keeping money in a suitcase which he kept in his room. He kept part of his savings there in bills of larger denominations. He deposited some money in postal savings accounts in the early years. He also kept part of his money in several bank accounts, as set forth here following: NATIONAL BANK OF DETROIT
Bank #84589
With-
Date
drawals
Deposits
Balance
2/14/41 $ $ 350.00
$ 350.00
3/21/41
80.00
430.00
5/20/41
220.00
650.00
6/19/41
50.00
700.00
9/19/41
330.00
1,030.00
9/30/41
500.00
530.00
6/14/ Int.
1.00
531.00
10/20/41
130.00
401.00
4/16/42
700.00
1,101.00
5/ 1/42
126.00
1,227.00
5/26/42
113.00
1,340.00
12/ 1/41 Int.
.86
1,340.86
6/ /42 Int.
2.18
1,343.04
6/17/42
128.00
1,471.04
10/ 2/42
160.00
1,631.04
10/21/42
80.00.h1,711.04
11/18/42
164.11
1,875.15
12/ 1/42 Int.
7.08
1,882.23
12/16/42
84.00
1,966.23
3/16/43
400.00
2,366.23
5/19/43
234.00
2,600.23
7/ 2/43
240.00
2,840.23
8/ 6/43
260.00
3,100.23
9/21/43
200.00
3,300.23
11/ 9/43
300.00
3,600.23
6/ 1/43 Int.
9.61
3,609.84
12/ 1/43
12.01
3,621.85
12/ 8/43
1,000.00
2,621.85
1/11/44
600.00
2,021.85
4/ 5/ 700.00
2,721.85
5/16/44
1,600.00
1,121.85
6/ 6/44
900.00
2,021.85
6/ 1/44 Int. $ $ 2.77
$ 2,024.62
7/ 6/44
2,968.22
4,942.84
7/11/44
1,000.00
5,992.84
8/ 4/44
3,000.00
2,992.84
9/ 5/44
800.00
3,792.84
10/17/44
450.16
4,243.00
11/10/44
522.00
4,765.00
12/ 4/44
235.00
5,000.00
1/23/45
500.00
5,500.00
5/ 1/45
1,000.00
6,500.00
12/ 1/44 Int.
8.99
6,508.99
6/ 1/45
18.26
6,527.25
6/ 6/45
500.00
7,027.25
7/ 3/45
500.00
6,527.25
8/23/45
500.00
6,027.25
9/11/45
500.00
5,527.25
9/13/45
2,200.00
3,327.25
11/20/45
672.75
4,000.00
1/ 2/46
800.00
4,800.00
12/ 1/45 Int.
12.60
4,812.60
3/ 8/46
1,300.00
6,112.60
4/ 8/46
600.00
6,712.60
5/ 2/46
1,300.00
8,012.60
6/ 3/46
412.00
8,424.60
6/ 1/46 Int.
18.05
8,442.65
10/17/46
3,333.33
11,775.98
10/23/46
5,000.00
6,775.98
10/31/46
500.00
6,275.98
4/ 8/47
1,865.00
8,140.98
7/ 8/47
800.00
8,940.98
12/ 1/46 Int.
11.85
8,952.83
6/ 1/47
20.98
8,973.81
*290 THE DETROIT BANK
Bank # GR-J-52440
Date
Deposits
Balance
1/12/44
$ 200$.00 200.00
1/19/44
700.00
900.00
1/28/44
100.00
1,000.00
2/17/44
300.00
1,300.00
3/ 2/44
700.00
2,000.00
5/ 8/44
1,000.00
3,000.00
7/31/44 Int.
5.83
3,005.83
6/ 6/44
1,000.00
4,005.83
11/30/44 Int.
19.19
4,025.02
4/ 7/45
500.00
4,525.02
5/31/45 Int.
20.53
4,545.55
6/ 6/45
1,000.00
5,545.55
11/30/45 Int.
25.75
5,571.30
1/29/46
1,000.00
6,571.30
6/ 5/46
700.00
7,271.30
10/ 3/46
900.00
8,171.30
5/31/46 Int.
27.85
8,199.15
11/30/46 Int.
30.59
8,229.74
5/31/47 Int.
32.82
8,262.56
7/11/47
4,000.00
12,262.56
Before 1943 the petitioner did not report his income for taxation. When the petitioner became a partner in Bitzane's Restaurant in December 1943, the partners hired an accountant to set up the records for the new partnership who told the petitioner that he had to file a return, which he did. The accountant made the returns for the petitioner in 1944, 1945, 1946, and 1947. Petitioner never revealed to the accountant that he had made money at gambling or had money on deposit in the banks until 1947. In 1947 the petitioner decided *291 to take a trip to Europe and being a British citizen, he applied to the British Consulate in Detroit. Before the passport could be issued to the petitioner, it was necessary for him to obtain clearance from the Bureau of Internal Revenue. At the request of the Alien Clearance Office of the Bureau of Internal Revenue, the petitioner produced his bank books. After a comparison of petitioner's tax returns and his bank books, a series of conferences followed resulting in the notice of deficiencies. The Commissioner used a "net worth" system in determining that deficiencies existed in the petitioner's tax liability. The understatements of income so found were as follows: 1942
1943
1944
1945
1946
Understatement of Income
$2,315.23
$827.64
$7,959.97
$4,148.30
$5,016.17
Petitioner's failure to file a return for 1942 was due to wilful neglect. It was not due to fraud with intent to evade tax. Petitioner's returns for 1943, 1944, 1945 and 1946 were filed with a fraudulent intent to evade tax. Opinion VAN FOSSAN, Judge: The record in this case is so confusing as to be at times incoherent. We are left entirely in the dark so far as specific proof *292 of many important factors is concerned. According to his testimony, petitioner, in 1930, had $5,000 in cash when he and Mikis went into business in Chicago. Petitioner invested $2,000 for himself and advanced to or for the account of Mikis the sum of $3,000. Twenty-one months later, or some time in 1932, the venture having proved unprofitable, it was sold for $150. Apparently, petitioner lost his investment of $2,000, while Mikis still owed him the $3,000. We say "apparently" because the proof is not complete. In 1933 petitioner paid $900 for an interest in a Cicero, Illinois, restaurant. This also failed and, after two weeks, petitioner abandoned the effort and returned to Chicago. What, if anything, he recovered of his original investment, does not appear. In Chicago a restaurant venture was successful for a short time, but was followed by another failure in Marion, Ohio, in 1934. Petitioner then went to Detroit, at which time he claims that he had $6,000 in postal savings, in banks and in cash. Whether this figure included the outstanding loan due from Mikis, does not appear. How petitioner was able to accumulate such a sum in view of the successive failures is a mystery. By elementary *293 mathematics it would seem that on petitioner's own narration of events he had invested all of the $5,000 for himself and Mikis in the restaurant business; that in this and the Cicero and Marion ventures he had personally lost approximately $3,000 and had an outstanding loan due from Mikis of $3,000 (later, according to petitioner, increased to $5,000 and not paid back until 1946). Thus apparently petitioner had lost or loaned all of the $5,000, and more, and, under the facts proven, could have had no cash on hand in 1935, when he claims to have had $6,000 in cash or on deposit. On the record of successive failures before us we are not able to find as a fact that petitioner had $6,000 in cash at the end of 1934. A similar study of the succeeding ventures is equally confusing and unconvincing. During 1935 petitioner worked for wages at from $10 to $20 per week. In 1936 he paid $300 for an interest in a restaurant, which he abandoned after four months. Whether he salvaged any part of his investment does not appear. He next bought an interest in another restaurant for $750, where he worked for the next 22 months, after which his partner bought him out for $750. Two months later petitioner *294 invested $1,300 in still another restaurant, which proved unsuccessful and which he abandoned at the end of three months. Whether or not there was any salvage, is not established. From 1939 through 1943 he worked steadily for wages, earning from $18 to $55 per week. Considering his frugal and austere manner of living, it is reasonable to assume that he accumulated substantial savings during this period. That this is probably true is seen from the fact that early in 1944 petitioner invested $3,500 in the Bitzane Restaurant in Detroit and after seven months' operation, sold the same for $3,500. This, however, is not established affirmatively by the record. Petitioner next invested $3,000 in the J. Quality Restaurant, which he sold in 1946 for $3,333.33. During the period of this operation he loaned one Klaris the sum of $2,000, which was repaid in the year 1946 or 1947. Summarizing, we find that during the period from 1941 to 1947, inclusive, petitioner deposited in excess of $37,000 in two banks. During this period he withdrew a total of some $16,000, there being on deposit in the two banks in July 1947, approximately $21,000. Assuming that the $3,500 invested in the Bitzane Restaurant *295 in 1944 went through the above mentioned bank accounts, the interest was sold for $3,500 during the same year and thus replaced in the bank. Similarly as to the $3,000 which petitioner invested in the J. Quality Restaurant in 1945, which he sold in the next year for $3,333.33. Petitioner loaned Klaris $2,000 in 1945, which was repaid in 1946; also in 1946 petitioner loaned Vassilou $5,000, which was repaid in 1947. The above transactions would seem to account for all but $2,500 of the withdrawals from 1941 to 1947. The repayments account for $13,500 of deposits, leaving $23,500 of deposits yet to be accounted for. Mikis repaid his loan of $5,000 by 1946. If this be deducted from the deposits, there yet remains $18,500 unaccounted for. In this connection, it should be pointed out that it is largely by conjecture that we deduce the parallelism in the above facts. Petitioner never undertook to identify the exact deposit with a particular transaction. In an attempt to reconcile the remaining deposits, petitioner advances the claim that when he went to Detroit he had $6,000 in cash, which he kept in a suitcase in his room, which sum grew to $10,000 by 1941; that he kept this $10,000 intact *296 until 1945, when he began putting it in banks from time to time and "little by little." If this explanation be believed and accepted it would substantially reconcile the amounts deposited in the last three years. However, we are unable to give credence to the suitcase story. The testimony as to the same is inconsistent and wholly unconvincing. If we discard the suitcase story as a fabrication, which we are obliged to do, and recall petitioner's record of failures in the restaurant business, the question obtrudes, - how did petitioner acquire the remaining unaccounted for cash deposited in the two banks? We conclude that those funds were the proceeds of petitioner's gambling activities. True, petitioner denied that he was successful in his gambling operations, except in 1947, when he admits gambling to have been his principal activity and when he returned $2,665 as income therefrom. Petitioner admits some gambling in the other years. We believe it was his principal source of income at all times. Petitioner played for high stakes and was at pains to demonstrate how he could win perhaps $200 on a game of pinochle or $1,000 in a single day's play. We are of the opinion that petitioner *297 earned income which he did not report in the amounts found by the Commissioner as reduced by concessions made at the hearing or on brief. Certain it is that petitioner, on whom rested the burden of proof, has not discharged that burden and proved the contrary. Passing to the matter of penalties, petitioner's counsel admits the liability for a 25 per cent penalty for delinquency in not filing a return for 1942. He contends, however, the petitioner was not guilty of fraud. After careful study of the record, we are convinced that the omission of the large amounts of income by petitioner from his returns for the years 1943, 1944, 1945 and 1946 was due to fraud with intent to evade taxes. As to the year 1942, the evidence is not such as to justify a finding of fraud. Decision will be entered under Rule 50.